Good afternoon, we will resume by calling upon Mr. Lossborough to continue his presentation as to the issues that the court has designated. Thank you. I want to. With regards to the record. The district court. We respectfully submit and I mean respectfully failed in many ways big and small to do its job in this case. I know we're going to get into detail as we should on that. I'd like to begin with a legal question because I would like to be able to hear from you and to think about this issue and to engage with both of you with a clear sense of what the legal framework is that you believe we need to be applying here. Your brief, of course, raises a constitutional claim as I understand it. I think clearly the Federal Death Penalty Act is raised and the Court Reporter Act gives rise to your claim of claims here. And I think actually most of the cases that you say in your brief make reference to that act, to the Court Reporter Act. So what is the test here that we're going to apply? Does the test derive from the Court Reporter Act's language or is there some other constitutional or statutory standard under the FDA PA that we are to apply here? So two quick introductory points. First of all, obviously the Court Reporter Act is only pertinent to half of our claim because our claim partly has to do with correspondence with the court, emails and so forth that were not of record. With regard to untranscribed proceedings, the Court Reporter Act is pertinent. But the real legal framework here comes down to a combination of the Federal Death Penalty Act, which requires that this court review the entire record, something it's not required to do by law in other cases, although I'm sure the court tries to review as much of it as is pointed out to it in the course of briefing. And the other, and in some ways the real centerpiece of our argument, and I think it's good that you asked this because I think it's important that we make this clear to the court, is Federal Rule of Appellate Procedure 10. The real error occurred here in the court fundamentally denying our application to reconstruct the record. Well, before we go there, it seems to me that as certainly applicable as Rule 10 is here, it doesn't necessarily come to your aid. Aren't you, weren't you, don't you remain under an obligation under Subsection C to assemble a record here, to attempt to assemble a record? And if that's your obligation, why didn't you do so? We did. We did our very best to fulfill that obligation. You pursued what, at least from my perspective, looks like a very broad discovery request, but you never took what you had and presented it to the court, which is, as I read Rule 10C, is what you're really required to do. Tell me how I'm wrong about that. I'm not sure I understand. So the court's point is that what we should have done is taken the record that we had and said to the court, we want all these other things. 10C has some prerequisites in it, right? 10C says, if you don't have a transcript, then you come forward and you say, this is our recollection of what it was. From the best available means. And I'm not trying to put words in the Chief Judge's mouth, but I had sort of things like, where in the record is it that you came forward and said, this is our best attempt at recreating that portion of the record. Now help us with it. So what we did was we, from the record that we had, we made a list of all that which, from context, we could tell was missing. We then made every attempt through the court, through counsel, through the prior counsel, through the government, to fill in those gaps. Where is there a presentation? I don't want to get caught up in form over substance, but where is there ever a submission to the district court that says, Your Honor, based on our discussions with Mr. Perpera and Mr. Sullivan, this is as nearly as we can recreate the back and forth that occurred on such and such an occasion. Let's use the jury instructions as an example. There's not a transcript of the jury instructions. There is a final set. We've talked about this with Mr. Perpera. These are the points he said he objected on, and this is what we would like some help recreating. Is there something like that? Or is it just that you guys went to the court and said, hey, we don't know what happened. Fix it. No, no, not at all. And so I'll give you – well, actually, it looks like my numbers are obscure, but we filed a motion with the district court, which included an Appendix B and an Appendix C, which are all in the record here. Those appendices – Appendix B was entitled Material Relating to Undocumented Written Communications between Counsel and the Court, and it was an extensive list. Yeah, you identified holes. Nobody's questioned that. Right. You were aggressive about identifying holes. Right. What I'm trying to find out, and I think my colleagues are interested in too, is did you ever do what Appendix C says and attempt to recreate the record by saying, look, Perpera was here, we spoke to him, this is what he said. We reached out to Mr. Trotten about this to check what Mr. Perpera said, and this is what he says. Now, this is our best recreation of the record, and we're presenting it to the court because we think this preserves whatever objections were made. Is there anything like that? No. The rule says, and I concede that the rule can be read as permissive, at least in terms of your preparing a statement, but it sets forth in doing so a pretty clear procedure, which is you do your best, for lack of a better term. You put it together, and then explicitly the statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. And if that can't happen, then obviously you proceed otherwise. So, Your Honor, we had no idea of what was missing. This was a case in which we went to really great lengths over a long period of time to attempt to gather the record. One thing, let's stick with the jury instructions. Is there any record of going to Mr. Perpera and saying, tell us what was objected to? There was no record that was provided to the court with regard to that. Okay. Anybody reach out to Mr. Troy or the ASAs and say, this is what we think was objected to? Well, Mr. Troy was certainly copied on that correspondence and could certainly have, I mean, to the extent that he knew what had happened, he certainly could have clarified the record. I mean, it was very clear what we were asking about. And we do know from the record that whether or not you or your colleagues as counsel for the appellant pursued this inquiry relative to the instructions with Mr. Perpera. Following the jury charge, Judge Surek did explicitly inquire, and it shows in the record, whether or not there were any additions or corrections. The standard rote language that any of us who have been trial judges have used hundreds of times, do you have any additions, corrections, or exceptions to the court's charge? And there weren't any. Right. And that's the problem. Well, it's the problem, I suppose, if Mr. Perpera was being disingenuous or being inaccurate even, but maybe he should be taken at his word, literally, for what he said. Yes. Or it's an IAC claim, I understand. But the issues here have – I mean, let's go, for example, to the jury instruction that we were talking about before with regard to transferred intent. What happens in the – but you know, because we know some of that. I mean, what happens in the transferred intent situation is that both sides submit proposed charges. Neither of those charges include a charge on transferred intent. Somehow, at the end of the day, the transferred intent charge makes its way – and then there's a charge conference, a lengthy charge conference. It looks like, from what we can tell, that it was about an hour and a half. There's no – we have no idea what happened at that charge conference. And you're right that there was nothing on record that says what happened there. There was nothing to prevent, as officers of the court, the government from explaining what had occurred at that point, particularly when we raised it. Or defense counsel. Or defense counsel from doing that. We don't know. I mean, the answer to your question – I mean, this is not in the record, so, you know, you'll do with it what you will. Of course we tried to find out what happened there from defense counsel. If we knew the answers to those questions, we would provide them to the court. This was an effort – we made an effort here to reconstruct the record that, in my experience, is pretty extraordinary. I mean, we went through, you know, thousands of emails. We went through all defense counsel's files. We talked to them. They were not, frankly, terribly cooperative. And, by the way, they became more cooperative with regard to one set of issues that the district court ordered. So we went to the district court and asked the district court to order them to cooperate with us. The court did so only with respect to exhibits, after which, yes, we got the exhibits. If the court had ordered – and we asked the court to enter an order that would have allowed us to more capably reconstruct the record, and the court denied that application, and you have that opinion in quite insulting terms, actually. Can you generalize what aspects of the record you are missing that you find necessarily important to a full and fair appeal? So we've set that forth in our brief, and it's as well in the – you know, these exhibits that I've mentioned to you. And I should say that the exhibits you can see are sort of living documents, because those exhibits – and I'll get you the specific appendix references in a moment. For some reason, I might have blacked out. They included asterisks where we initially said we didn't get things, and then we did receive them, and then eventually we don't receive them. But just as a general matter, these were – let me back up and say, our initial – the initial response that we got, both from the government and from the district court, were there's nothing to worry about. This was no big deal. We only had conversations about scheduling, bathroom breaks, you know, that kind of thing. That was a response from whom? From the court. Isn't that a finding of fact? So it's a finding of fact. It's as clearly erroneous as clearly erroneous can be, because you can tell from the context, and we provided this, that there were at least 50 – I mean, including jury instructions, but at least 50 documents, emails, correspondence, that sort of thing, that went to such issues as the constitutionality of the jury pool, the admissibility of victim photos, jury instructions, the impact of the special administrative measures, the SAMs on Mr. Kabanu's ability to put on a case in mitigation. All – these are just – go to the appellate issues that are now before the court and not to issues that we don't know might have existed. So those are areas, those are substantive areas, where if the court said that it was just engaging in routine matters of scheduling, it was as clearly erroneous as clearly erroneous could be, and frankly, false. And you went back to Judge Sturrock and tried to get his response back. Yes. And what was his response? You have his opinion in which he says it would be – we were bizarrely asking for a discovery from the court, it would be too burdensome from the court to put together. The way records are reconstructed is often from, for example, the notes of counsel in the court. We asked for the notes of counsel in the court. If we had them, you have them. And I'll give you an example of that. I mentioned earlier when we were talking about substitution that after Mr. Sullivan made his application on June 19th, that on June 25th, I think it was, he then sent a follow-up email to the court saying times of the essence are an everyday count. That was something that we got. Judge Sturrock, in one of his opinions and in response to your request, goes into detail about considerable steps taken, various measures taken both within chambers and by the clerk's office to be responsive to you and to fill or attempt to fill certain gaps that you allege were in the record. Did he not? I mean, there were extensive efforts made both by chambers and by the clerk's office. I don't know. He said that there were extensive efforts made. He also said that they refused, for example, to look, Judge, at emails. And I'm having, it's beyond me. If I need to look at, if I need to find my emails back and forth, if those are archived, you can find them. They refused to do that. You're not referring to the judge's emails, are you? Yes. Your position is you're entitled to discovery of the court's emails. And where does that come from? No, Your Honor, not of all of the court's emails, of course not. But where does it stop, Mr. Sturrock? Here's where it stops. What we were referring to was one thing and one thing only, which was that this was a case in which submissions were made by counsel for both sides to the court by email. We're not looking for the court's emails, personal or with clerks. Your Honor, we were looking for what should have been on the docket of pleadings, but were instead done by email. For example, Mr. Pleading. Explain to me. So let me, again, use a concrete example because it's an important one. So that email where Mr. Sullivan says six days after he files his motion on June 19th to appoint Mr. Perpura and says every day counts, we're waiting, this is important, which goes to an incredibly substantial part of our case on appeal, that it was important that counsel be appointed then. That's our argument, right? That that was something, that was an email from Mr. Sullivan to the court. And we know that. Right, because we got it from Mr. Sullivan. There are other emails, and we've identified them with specificity, where they're referenced. So we're not asking for broad discovery, give us all of your emails. We were looking for emails that substituted for pleadings. And I can tell you just from experience that, you know, when you're in cases, sometimes you communicate with the court by email. These days courts are much better than they were back then about making sure everything gets posted. Back in my day as a trial judge, right? Not that far back. I mean, this is just the reality of the way things have changed a bit. But there's no doubt in this case, because we've shown it, that there was correspondence between the – not between counsel. I mean, the government says, you know, obviously people have conversations all the time, all those should be recorded. That's not what we're saying. We're talking about proceedings that should have been recorded. Do you have to show prejudice, specific prejudice, with respect to gaps in the record? What are we to make of the Sussman case? So we have to show that – I think we have to show that the record – yes, prejudice in the sense that the court does not have a complete record. That's the way that prejudice is measured. Not just that there's not a complete record, but that in some form or fashion, your ability to prosecute this appeal was materially affected in a negative way. Right. And I think we've done that. All right. So give us what is an example, or give us multiple examples of how you have been unable to make the argument you wanted to make because of the gap in the record. I should be able to tick off more examples than I'm going to be able to, but I'll give you a few that come to mind immediately. With respect to – I'm going to focus on issues that we actually have raised as opposed to, obviously, issues that we haven't raised because we couldn't have known. But take, for example, this. We know from the context that there were communications between the court and counsel prior to Mr. Purpura – I'm sorry, Mr. Sullivan filing his motion on June 19th. I mean, I would really love to know whether in those communications, what the court said to Mr. Sullivan was, make sure you get somebody who can be ready to try the case, then we're not going to broker any relations. Had that inquiry specifically been made to Attorney Sullivan? I don't believe – I'll ask my colleagues. Not that's in the record. And that's what gets to the heart of this because I think 10C is not – because I take it part of the reason it's in there is to prevent this kind of discussion where somebody says, I didn't get it, I couldn't get it, and then the court on appeal is left saying, how do I know that you didn't do everything you could reasonably do to recreate the record? And if I may, it explicitly, directly involves the district judge in the process. Which we did. But not in this way, right? That's the point. Here, not to put too fine a point on Mr. Lesburg, and I certainly don't intend to speak for Judge Sirk, but as you noted, the tenor of his response to you at one point seemed to create a little exasperation as if to say, look, all you've done is come to me and say, gimme, gimme, gimme. I want more. I want more. Give it to me all. Gimme, gimme. And if you don't gimme everything, I'm going to say it's unfair. That's kind of – now, I'm reading between the lines, but one gets the sense that he felt there was a statement being made, which was not a legitimate, I'm trying to recreate the record, but I'm trying to create an issue for appeal. That's maybe, I'll repeat, maybe unfairly reading, interpolating, but one might see that in the way he was responding. The rule of appellate procedure tends, he seems to be saying, look, we can avoid that kind of stuff if you, the lawyers, will follow this process. And then there's a record of what you did, everything you could, and then the court rules on what you did. I agree with your read of the tenor of Zersherik's opinion. I don't agree that we didn't do what we – we did nothing like say, give us everything. That was not what the request was. We had specific items that we specifically identified based on context, particular proceedings, particular documents, particular correspondence, particular emails. Those are what we provided in our motion to the district court. And, by the way, also pursued with the government and with defense counsel. Well, what should we do? Let's be concrete again for a second. Let's use the jury instruction as the prayer conference is an easy thing. Because I, for one, at least am in agreement with you that that's not a scheduling matter or a bathroom break, right? You're talking substantive law in that room about the jury instructions. You've acknowledged here that there's not a record that was made of, okay, this is what Purpura says happens, this is what we got back from the government about what happened. This is as nearly as we can figure out what the objections that were made were. Now, judge, rule on this. Is this, in fact, the objections that were made? There's nothing like that in this record, right? That's right. Okay. But since that didn't happen and 10C does exist, what are we to do with the objection with respect to the jury instructions? Are we to say, well, 10C doesn't matter? What are we supposed to do with that? So that's a preservation issue. Indeed. That preservation of the objection issue. Right. And so let's talk about why that's a good example. I mean, in that circumstance, of course, one possibility would have been that at the conclusion of the charge conference, with the charge conference not having been recorded, that defense counsel could have said, let me put my objections on the record. That could have happened. Rule 10C does not require that. And, in fact, this court's precedents don't require that. This court's precedents say that where there's an objection made at the charge conference, that that's preserved. But, of course, we're lost on that. So we don't have that. We'll never have that. And, indeed, that may very well explain why, as competent an attorney as Mr. Now, he knew it wasn't going to be on the record. That's another question. But the point is, to answer your question directly, what can you do? Right. What are we supposed to do when what's presented to us on this issue, on this focus on this one thing, clearly is not in keeping with Rule 10C. Are we supposed to say, well, 10C, you know, it has a may in it. So you do it. You don't do it. Okay. Or do we say, wait, there's a method provided for in the rules for recreating record when there isn't one, and it wasn't followed here. Therefore, the onus of that falls on the parties seeking to take advantage of it. Of course, I would push back on the idea that it wasn't followed. I mean, what we did not do was to propose, because we didn't have a good faith basis for setting forth what happened. We didn't have the information. So instead, having specifically requested it, and having nobody, including people who were there, come forward. Did you make a record, Mr. Lusberg? I am so sorry. No. Did you make a record, Mr. Lusberg, that these are the things we've done to try to recreate what the objections at the charge conference were, and we don't have anything. So is there even that? So we filed an appeal with this court. There isn't, right? Because if there was, I think I'd have seen it, and I think you would have talked about it. No, no. So what we don't have is a lengthy recitation of our efforts to interview people and the like. What we do have is a careful listing of all of what we requested, what we received, and what we didn't. Contextualized such that you can, in most cases, tell what it was about. You know something about what the subject matter was, and there are subject matters that go directly to the issues that are here raised on appeal. That you can tell. Let me adjust this slightly for my colleagues to let me. This jury instruction is an example of where, even if we were to ignore 10C, I think you acknowledged earlier that if we said, well, we'll take it as a given that the objection was made as to transferring 10. We'll take that as a given. That resolves the problem with respect to that, right? Yes. And you said yes. What other problems are there that are gaps in the record that could be addressed in that fashion? So I'm not sure. There are other areas where the, so really on substitution, a lot of the questions come down. So a lot of the questions come down to what the back and forth was with the court as far as whether it would or would not be willing to entertain an application for additional time. There was, for example, and I'll give you another, this is one I was going to get to. I'm sorry, at what point? So I'm about to tell you that. So there's a status conference that takes place on August 1st. On the day before that, July 31st, this is 2012, there's an off-the-record conference that we requested that where, which then gets embodied in the order that the court issues on August 1st. That is untranscribed. And that's not one where that can be resolved by just waving your hand and saying, well, I'll assume that something happened there. But it's one where we can, what's the August 1st order say? The August 1st order sets the trial dates. And it says that jury will come in on September 26th, the trial will start on January 7th. That's what it says. Oh, and it talks about Bourdier will begin on November 5th. So to make your point that on the record, it had been on the record, a discussion would have to have said something like, and this is a scheduling discussion, it would have to have said something like, and I will under no circumstances entertain any application for a continuity. Right. So the claim you are making and have to make, I guess, for this to make sense is that might have been said, even though nobody around that time said anything like that. That might have been said there, and you should assume that was said there, and you should assume prejudice to us because that's why people didn't speak up later. I mean, that's the speculation you're asking us to engage in, right? It's speculative, although it's not quite as speculative as you say, because when you say that nobody said anything like that at the time, I didn't get to go into this earlier, but there are numerous places where, and we discussed this a bit earlier, where the court says, I'm not moving this, we're keeping this moving, come hell or high water, I'm not changing the trial date, those kinds of things. So there's some raw material to support that kind of thing. I mean, I think there are inferences that could lead to that, but no, look, when one is talking about what's missing from the record, yes, you're necessarily speculating to one extent or the other. And the questions that you're asking go to a process which we attempted really as vigorously as we could to vindicate by being very specific with regard to our requests, both with regard to transcript portions and with regard to documents. At the end of the day, the assessment rule that you have to make a specific showing of prejudice has to guide our decision on this point, on this set of arguments, right? Prejudice defined a certain way. Obviously, you're never in a position under these circumstances to show prejudice by saying what would have been there. But we can't enter the realm of metaphysics either. I mean, we've got to have some basis for reasonably believing that something specifically that you have in mind exists, right? Your Honor, in this record, we did our very best, and I think we succeeded, in providing sufficient context for you to know what the subject matters of the communications and proceedings at issue were. And I think that when you look at those, you can understand that they go to significant enough issues that Sussman is satisfied. But even more than that, I think they go to significant enough issues, and this may be almost any issue, that they satisfy the dictates of the Federal Debt Penalty Act, which require that this court review the entire record. The district court simply did not create a record, and it is the district court's responsibility, and it was furthered in the district court's responsibility and, honestly, my colleague's responsibility from the U.S. Attorney's Office as well, to assist in that process and not just sit back and say, you're not making it. That's counsel's responsibility too, right? Is the federal counsel on the record responsible to say, hey, Your Honor, I know we were off the record, but I voiced an objection. I think it's important that it be on the record, and I want to say X, Y, and Z. Right. You've tried cases. I've tried cases. I can't remember an occasion where a good counsel didn't make on the record a statement about something that counsel thought was important, and if they didn't make it, it wasn't because they were stupid or inept. It's because it didn't matter. We don't know whether that's what happened. There's possibly some tactical reason for that. There could be, and that's the sort of thing that would be subject to some sort of – that's why – that's the difference between this proceeding and an ineffective assistance of counsel proceeding where one examines the question of whether there were tactical reasons. But what Rule 10 provides – so here's the thing about Rule 10. Rule 10 assumes that there will be things missing from the record through, quote, error or accident. That's the language of the rule, and it says that where there's error or accident, that proceedings that were not recorded should be reconstructed in order to, quote, truly disclose what occurred in the district court. So there is a process that's supposed to take place for this. We moved for that process before the district court, which is what we understood we had to do. But that's where – okay. That's where I'm having a hard time because I thought we'd established that, in fact, you hadn't done that process. I thought your argument here before us was, look, it's true we didn't do that, but we did some other stuff which is just as good. Because if there is a record of you following the 10C procedure, look, I haven't seen it. No, the 10C procedure that you were describing was one where we proposed a particular reconstruction. That we did not do. That's what the rule says. That's what the rule calls for. I mean, I can read it to you. You've got it in front of you. It provides for you to prepare the evidence of the proceedings from the best available meanings, including appellant's recollection, serving those on the appellee, and then objections or proposed amendments within 14 days. It's very specific with timelines and everything and going to the district court. That didn't happen. No, that didn't happen because we couldn't have done that in good faith because we did not have that information. You could have gone – you absolutely could have gone to the court and said, I've spoken to Mr. Purpura. This is his recollection. I've spoken to Mr. Troyer. This is his recollection. This is what we think was objected to at that conference, and we want the court to rule on it. You know, Archer, isn't the argument that you just espoused circular? I mean, we couldn't do it because we don't have this, but when we don't have this, that's why we're supposed to follow the rule 10C. Here's the answer to that question of why it's not circular, and it answers the question. We tried, and when I say we tried, and this is in our – this is – thank you. I was about to say, you'll find this at A2106. In our appeal to this court from Rule 10, we made clear that we had tried, but that trial counsel either couldn't or wouldn't help us with regard to the unrecorded proceedings. So we – that is in this record that we tried to do that. Counsel was uncooperative, so we sought the assistance of the district court, and what the district – and I should note – I recall this is a general assertion in the discovery, quote, unquote, kind of discussion that ended up in front of us. What I'm trying to get at is, again, I'm trying to be real specific. Is there a record – because I'm not recalling if there is one that was specific to, for example, the jury instructions. This is what I asked for. This is what I got. This is my contact with the other side, and this is what we're asking for. Because I know you made a general objection. I know that, where you said they're not being helpful. That's not what I'm asking. It was more than that, Your Honor. We did specifically talk about what we wanted. That is – I mean, if you look at these submissions, we went in great detail into the particular proceedings and the particular correspondence. If we could have – if you'd stop for just one moment. We've had another hour expire, and we need to put more time on the clock, please. For recording purposes, especially. Thank you. I just want to note that while we were off the record, Judge Jordan said that was for recording purposes. Well done. Yeah, I've made a note of that. So what we – so here's specifically what we did. We set forth for both the district court and everybody else what it was we were looking for. When we were unable to get their assistance voluntarily, we went to the district court, which gave us assistance with regard to one set of materials, which were the trial exhibits only. As a result of that assistance, we, in fact, got the trial exhibits. And so the question here becomes, under Rule 10, what happens if you can't – just to interrupt the circularity point, what happens if you make every effort, you can tell from the context that there are missing materials, the court is under an obligation to have the entire record before it, you make every effort to create that record, you can't do it, you go to the district court, and the district court says, I'm only going to give you one part of this. The rest of it, I'm exasperated, I'm frustrated, this is taking more time than the trial, I'm not going to do it. And that's what happens. Is there a difference between a proceeding where something substantive is discussed and a proceeding where something substantive occurs? Well, if something substantive is – there may be a difference or there may not be a difference. If something substantive is discussed, that may be relevant to what was preserved. It depends upon – I mean, I don't think I can answer that in a general sense. I think it depends upon the nature of the argument. But let's be clear. This is an unusual case, I think, in terms of reconstruction of the record because of how hard we tried. And because, frankly, I mean, it was frustrating to all of us that the district court did not provide further assistance to us in terms of requiring that defense counsel in particular help us. We ran into a brick wall. And that's what's portrayed in the record before this court. One point that my co-counselor pointed out to me in notes is that with regard to Sussman, so the prejudice – so Sussman's a case about a reversal as opposed to the other form of relief that we have requested here, which is, of course, this court could now order a remand to reconstruct the record as well and would be well within its authority to do that. And that courts have done that. That's all I have. Thank you very much. And we will have Justice Osment back. Thank you. Good afternoon, Your Honor. First of all, Judge Stark doesn't need me to detune him, but I just have to say much of what we're hearing today is very unfair to Judge Stark who worked arduously in this very difficult, very sensitive case. We heard it this morning with regard to the continuance. He has a hearing. The lawyers tell him we're ready, we're qualified, we're going to be ready, there's no objection. And now it's being argued that everything that then happens in the next six months involving this difficult trial has to be thrown out. And here's the same thing where the judge – to have an argument over jury instructions off the record. Yes, it's very common. It's not, I wouldn't say 100 percent, but it's a common occurrence that judges have conferences in the chambers. And when we use the term argument, we're talking about what would also be known as a charge conference. Yes, a charge conference is a discussion, and it's very common. Many judges do it in chambers. If you have disagreement with jury instructions, can you go back and tell the judge, I want to put on the record my objection, my disagreement? Absolutely. And what we need to discuss here is what is the court's obligation, what is counsel's obligation, and what is a record. And the court absolutely is required, as Judge Fuentes suggests, is required to give the parties an opportunity to make their objections on the record. There is no suggestion anywhere here that Judge Surik did not do that. In fact, he heard months and months and months of proceedings. It's counsel's obligation to make those objections and to put them on the record. And it's fundamental. Judge Jordan referred to good, competent counsel. I would say any attorney I've ever seen in a courtroom knows when you're on the record and when you're not on the record. I mean, it's just fundamental to our practice to know that when you're talking to a judge, you have to be aware you're talking to a judge. And it's either on the record or not. And if you want something on the record, you make that clear. Now, that happened in this case. If you look at the record, with regard to the jury instructions, the judge did exactly what every counsel knows is going to happen, called them up to sidebar after the instructions were given, asked if there were any objections to put on the record, and they did put objections on the record. And then a different lawyer from Mr. Merritt, not from Mr. Savage, from Mr. Merritt said, well, you know, and we preserve anything we said back in chambers. And Judge Sturek specifically said to all the lawyers. He reminded them. He said that's not good enough. We weren't on the record. You need to do it now. Remind me, if you would, please, and I'm sorry. This is just because I had forgotten. What was the specific point, objection, or exception that was made by defense counsel after the jury instructions, and which obviously was not the transferred intent instruction? There was an objection. There was, and I don't recall exactly. We'll pull it up now. That's all right. We'll pull it up, and I'll have it for you momentarily. The other important thing that we need to define here is not just the court's obligation and counsel's obligation, but what is a record? What is a record? I think that was Judge Jordan's first question here. Or Judge Smith. Right, and there are several rules that apply here, and the point I'm going to make is that none of them extend to the things we've been talking about here for years, which are e-mails and notes and scheduling conferences. Does it matter what you call something? I mean, I suppose that it can, but Mr. Zosmer, if you're making a substantive point in an e-mail, as opposed to the filing that says motion, or if your request of the court is to do something, whether you've done it in an e-mail or you've done it in a motion, shouldn't that be docketed and made part of the record? It should be, but it also shouldn't happen at all. And we have no indication here that it did happen. I don't think... Okay, I'll give you an example. They assert, for example, that they never would have found out that there was an e-mail from Mr. Sullivan to the court saying, in effect, I urge you to act on our substitution motion, our substitution request now, every day counts, because that is a substantive request for action from the court, and it was in an e-mail, not in a motion, and it has, they believe, substantive effect. And they never would have found it because the court didn't get it to them. So what are we to do with that? Are we just to say, well, that was a one-off, it was curious, or are we to be concerned that there was more of that nature perhaps going on and that this was not an activity where the district court was correctly docketing things that were coming from counsel? It would be appropriate to docket that, given that the same request had already been made. I don't think it's that significant an event. But it wasn't docketed. It wasn't. And the question is, was this happening wholesale? And there we have the district court's ruling on that. The district court has stated it did not conduct this case by e-mail. There were no substantive conversations off the record that they can recall in any, let alone in any bulk. And that is a factual finding. Well, it may be a factual finding, but then I'm curious like Mr. Lusberg is with something like a charge conference happening off the record. That is a substantive discussion of the law that will govern the jury's deliberations. It's not being transcribed. It's clearly not scheduling. It's not bathroom breaks. It's a discussion about what the law is. And it's not on the record. So I'm not pleased by your saying this just, I mean, there's a funny fact that nothing of substance happened off the record. There was a whole charge conference that happened off the record. Absolutely. And the charge conference, and I suggested this earlier today, charge conference and the jury instructions is a separate matter. There's a body of practice and body of law that applies to that. It is common for judges apparently find it helpful to have an open discussion with counsel, trade drafts, discuss it in chambers, and then make formal statements and clear objections on the record. This is explicitly contemplated by Rule 30 of the Federal Rules of Criminal Procedure, which require an objection to be stated after the instruction is given. And the reason for that is because there are changes not just in the drafts, but then perhaps even in the way the judge articulates it from the bench. So that's a separate issue as to how jury instructions are prepared and delivered in federal court that is squarely addressed by the law. And with respect to that objection they have, where they want us to presume that objections were made that nobody can remember, with regard to that, the law is very clear on that. And the case that it's controlling in this circuit is Government of the Virgin Islands v. Cruz, which is the 1973 case that we cite in which this court said the defendant argues there was no point in making an objection on the record since he had already made his objections known in chambers. Aside from the fact that we can find no in-chambers record to support defendant's claim, we cannot permit Rule 30 to be circumvented in this way. So with regard to jury instructions, we know, I would submit, what the law is. And the court followed it. It gave the parties the opportunity. And by the way, with regard to the transfer of intent instruction, not once but twice, because it was essentially given in the penalty phase as well. And there was no objection stated. And to be frank with the court, the court can talk to Mr. Troyer also. I, of course, have discussed this with Mr. Troyer. He doesn't recall any significant argument regarding that instruction. And that's why nothing under Rule 10c has been submitted. An objection wasn't made, and Mr. Perfora, who's very good counsel, then did not state an objection when he was invited to on the record. So the jury instruction part, I don't think, poses any difficulty here. It's required that the instruction be made on the record. They have the opportunity. If they didn't do it, plain error review applies. With regard to everything else, we just have a tremendous amount of speculation that there were all these things, all these e-mails and correspondence. With regard to what is the record, the Federal Death Penalty Act, it's Section 3595, says that this court has to hear the appeal and shall review the entire record, including, number one, the evidence submitted during the trial. Number two, the information submitted during the sentencing hearing. Number three, the procedures employed in the sentencing hearing. And number four, the special findings returned under Section 3595B. That doesn't include notes of the judge. It doesn't include e-mails. The Court Reporter Act, 28 U.S.C. 753B, says the proceedings to be recorded include all proceedings in open court, all proceedings in open court in other cases that the judge is considering, and such other proceedings as the judge or the court may direct or as may be required by rule or order. These are very set and well-known rules as to what a record is. And that's why these requests were so extraordinary and really improper to ask the judge for his notes and his e-mails when it's the obligation of counsel to make a proper record during the case. Mr. Zosman, there's, I think, assertions made by the appellant that there were communications with the jury that were not on the record. What's the position of the government? We're not aware of any such instructions that wouldn't be any different from what time is lunch. This is all speculation. It's really worse than speculation. This is chasing ghosts. These long lists of discussions that might have been had on different issues where there's just no known basis for it, and we have an experienced, competent district judge telling us that he didn't have these kinds of substantive conversations. And then we have rule 10, finally, which says, which exactly defines the record on appeal. It says the record on appeal consists of the original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries. There's a set procedure here, as one of your honors suggested earlier. And then 10C says what to do. And even 10C is interesting because 10C says if the transcript of a hearing or trial is unavailable. It's all focused on what is said in open court. The 10C really doesn't apply to judge, let's recreate your e-mails. It all gets back to the obligation of counsel in the court to make a record in court, and then if something is missing or lost, this sets the procedure, which, of course, as Mr. Lossberg has acknowledged, didn't follow. They've never come here and said, here's the list of objections we were made and we want to recreate the record. So I think looking at this as a whole, there just has been no showing that anything is missing from the proper record, let alone showing that they were prejudiced in any way. The last thing that I want to address on this is the fact that I suggest that this court has actually already ruled on this. He discusses these appendices, B and C, I think, that were given to the district court that list these 50 speculative things that were not put on the record. These appendices were given at least 50, and then, of course, e-mails and notes and that sort of thing. These exact lists were given to the district court in mid-2017. The district court issued its opinion in September, which we put in our supplemental appendix, which goes into detail as to why there's nothing here. But then the application was made to your honors that this exact panel in October of 2017, the application was made that the judge should be ordered to do all of this, to produce the exact same list of conferences and things that supposedly happened. That was a 45-page submission that was made on October 10, 2017. And if you look at the docket on this court, and I'm happy we're going to have docket numbers now, I see, which I can't cite a number for back in 2017, but the filing on October 10, 2017 in this court, beginning on page 42, there's a summary. And what Mr. Savage's counsel says there is, accordingly, Savage respectfully requests that the court enter an order under federal rule of appellate procedure 10. Number one, directing the government to provide Savage's appellate counsel with a complete duplicate set of its admitted documentary exhibits. Number two, A, deeming all of the undocumented written communications contained in Appendix B to this filing to be part of the record on appeal. In other words, that list of 50 things. And B, directing the district court to provide Savage's counsel with copies of additional undocumented written communications between the court and counsel in this case, e.g., correspondence, courtroom hand-ups, e-mails, etc., that are in the position of the court or its staff. Number three, directing the district court to make all reasonable efforts to help Savage's counsel identify and reconstruct unrecorded proceedings in this case, e.g., sidebar conferences, bench conferences, chambers conferences, etc., including those listed in Appendix C to this filing. Those efforts should include providing and directing the government and all trial counsel to provide available non-privileged notes and information about when those proceedings occurred and what was argued, objected to, decided, and otherwise addressed during them. Number four, directing the district court to make all reasonable efforts to help Savage's counsel identify and obtain copies of exhibits introduced by Savage and his co-defendants. And then it goes into detail as to how that should be done. Number five was asking that the district court reporter be ordered to fix one word in one particular transcript. Number six, directing the government and Savage's counsel within 60 days  to comply with its order and on the status of the record on appeal. And number seven, continuing the stay of a briefing schedule until the record is complete. This panel ruled on this on November 30, 2017. And this court granted number one. It ordered that the parties in the court endeavor to provide all trial exhibits to Mr. Savage. That then happened in a matter of weeks. And then this court stated, quote, in all other respects, the application is denied. That was November 30, 2017. We should not be here two and a half years later being told that there's some error now that requires a remand or any other remedy. This court made the right ruling, which is you don't get to do this. You don't get to ask the court to help you reconstruct things. You get to follow Rule 10C, if you can, with regard to particular hearings and transcripts. They rely on one statement that Judge Smith made during the oral argument that we had that day back in 2017. Judge Smith said, quote, the panel has previously discussed that question, and I'll allow my colleagues certainly to correct me if I'm wrong or to speak otherwise. But if there are issues that are impacted by what you consider to be omissions in the record, those are apparent issues that can be raised in your brief. Now, that's correct. They can certainly argue that particular issues that they're raising now are affected by the state of the record. But in terms of this broader claim that the record itself is insufficient and they get either a remand or a new trial, we believe the law of the case is no, and that law of the case is correct based on all of the citations I've given regarding the various rules as to what constitutes a record. Thank you. Thank you very much. If we could again go back to putting 60 minutes on the clock, please. I'm paying attention to the clock, but I'm not being guided by it.  Do you want to combine your arguments on the remaining two issues? I was going to do that. Thank you. The two remaining issues have to do with jury selection. The first has to do with the statute, which was that in the court's specific question was whether the district court violated Savage's rights under 18 U.S.C. 3235. As the court knows, that statute reads that the trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience. Yes, and the trial was had in the county. It depends what the word had means. Thank goodness you didn't say it all depends what the word is. I could be broader. That really is the crux of the question, because as obvious as it may seem, let's be clear. The trial took place in the county. That's correct. It was conducted here in Philadelphia. An antiquated or archaic way of describing the fact that the trial was conducted in the county where the offense occurred. The archaic way requires that we look at what the drafters of that language had in mind. They know how to describe where and how a jury pool is to be drawn and how a jury is to be selected, right? There's really, Your Honor, no question but that this court has held in Vicorelli that that phrase, when it was drafted, meant that the jurors were to be drawn from that county. When it was drafted in 1862, they didn't just strike language. They said the language associated with jurors being drawn from the county is repealed. Now, I understand. We've read your briefs. We understand your briefs and the lengthy historical analysis that you've given it, but isn't a straightforward reading of that repealer? It's repealed, and so we're just straight back in ordinary venue, not in vicinage. That might make sense if the statute ever had anything to do with venue, but it didn't. The statute had to do with vicinage, and the statute, including the first phrase, which meant what it meant, remained. If you know our argument, you know that what we say is that in the absence of a clear statement that they were repealing that language, then that's- We do know your argument, and it does seem pretty clear. In fact, part of your historical argument left me wondering if it didn't injure you a little bit because I took a punch of your argument to mean that this repealer was put in place because of the Civil War and concern about treason and southern secessionists. You're explicit about all that without having to transport people from other jurisdictions. Now, if that was really a motivating factor that they thought, we want to be able to do this without pulling people from different places where there might be prejudice, doesn't that, in fact, make the argument that Congress definitely did not want there to be some restriction on where jurors had to be pulled from? In other words, that they were intending to make this straight up venue and kick vicinage to the curb. That ignores the phrase with regard to great inconvenience. The legislative history shows that that provision- Let's talk specifically about the language that was stricken. The original statute had the phrase, or where that cannot be done without great inconvenience, that being that the trial of offense is punishable with death, shall be had in the county where the offense was committed. Then it said, or where that cannot be done without great inconvenience, 12 petted jurors at least shall be summoned from thence. That's the phrase, starting with or, that was stricken. What was not stricken was the original phrase, which had a particular meaning that had to do with vicinage and not venue. What's left is that the trial of offense is punishable with death, shall be had in the county where the offense was committed, the original meaning of which was with jurors from that county, where that can be done without great inconvenience. Now, to your credit, you've acknowledged that you've got no case support for this, right? That's correct. There's no case support for- Every case that's looked at this has gone against the position you've taken. None of them, until this court writes an opinion here, will analyze it with this history in mind. What we do have, by way of case support, is Ziccarelli, which makes clear what the meaning of that first phrase was. Respectfully, what I think Congress did in 1862 was that it specifically said that, so if you have a situation where there's great inconvenience, you can tackle it however you wish to tackle it. You don't have to do it with this one option of summoning 12 jurors from the county where the offense was committed. Now, it says it should be had in the county where the offense was committed, where that can be done without great inconvenience. If there's great inconvenience, other steps can be taken. But in those days, before this was stricken, there was only one thing that could be done where there was great inconvenience, and that was that jurors had to be summoned from that county. After 1862, for the reasons that we set forth, Congress gave the courts greater discretion in terms of how to deal with quote-unquote great inconvenience. Well, the repeal language doesn't say anything about great inconvenience. It doesn't? No, it just says, in cases punishable with death, 12 petty jurors to be summoned from the county where the offense was committed, be in the same, is hereby repealed. It just says, we're just taking that, and it's out. We're not dealing with that anymore. Why shouldn't we read any more into that than what they say in that 1862 repeal, which is that rule's gone. Now, it just says what it says. You have to have it in the county, period. Well, you already have to do that under the venue rules, or in the district. But what Congress did not do was to change the language that always meant that the jurors had to be drawn from the county where the offense was committed. And this court has held in Ziccarelli that that's what that language meant. Ziccarelli also says in a footnote that the 12 juror thing got thrown out. The 12 juror thing, though, is that that second clause, let me concede this, that second clause initially shed light on what the first clause meant. That is to say, when you read the original language, which is that, or that cannot be done without great inconvenience, 12 pettish jurors at least shall be summoned from thence. With that language, there could be no question that it was a vicinage provision and not a venue provision. So the second clause certainly elucidated the first before it was eliminated. But by eliminating the, by deleting the elucidation doesn't mean that you change the meaning of the first clause. And that, those are, there we do have authority. When you say it doesn't mean that, that's the very question we're dealing with, right? You're saying it doesn't change that. A straightforward reading of it, one might argue it does change the meaning. Because what you're left with is the trial will be had in the county, and that's all you're left with. And that does change the meaning. That's the, that's the very issue we're grappling with. And in grappling with it, respectfully, and I can't say it any more than we've said it in our brief as you point out, that you're bound by what the original intention of the provision was unless that language was affected and repealed. And that's the case law. Affected. Unless it was affected or repealed. Well, unless it was repealed. Unless it was. Unless it was affected. Well, if it was affected, there would have to be a clear statement by Congress of how it was, of how this was done. And that is to say, you know, courts don't read repealers. It's hard to get much clearer than the statement that the requirement that 12 petitiors be summoned from the County Ready Defensors Committee is hereby repealed. That seems pretty darn clear, Mr. Bush. In the event, but the context of that is in the event of great inconvenience. That's because that's what the provision said. What was repealed was the idea that if there's great inconvenience, the way you have to deal with it is by summoning 12 jurors. Now in the event of great inconvenience, you could move it, you could do all kinds of other things. I'm just reading the words great inconvenience back into the statute. They're in the statute. No. Today they're in the statute. No, no. You're reading it into the repealer, right? You're reading the congressional, the legislative history. The language of the statute, you're reading a very brief explanation of what the legislative history is. I'm trying to follow your logic, and I apologize if I'm being obtuse. You're attempting to say that this repealer has in it the intention to preserve the idea that you have to draw from that pool unless there's great inconvenience, despite the language, the straightforward language of the repealer. If the repealer specifically repealed that initial clause, which meant what it meant, then that original clause remains, and that's the case law that we cited. So let me move on very briefly to fair cross-section. The court asked that we address whether the demographic composition of the jury pool violated Savage's right to have the jury drawn from a fair cross-section of the community. The question here is largely numbers, and the numbers, the question that the court obviously is going to have is what distinguishes this case from Howell or this case from any other case, because your argument here essentially says that prosecutions in the Eastern District of Pennsylvania involving people from Philadelphia are across the board systematically. No, so we didn't argue the point about people from Philadelphia. Our argument was just on race. You've withdrawn that, haven't you? It was never our argument. That was a code of defense argument. That's right. Not advanced it here. No, we didn't advance it in the district court either. I understood that. But the argument has to go beyond this case, is my question to you. Of course. If we were to say what you want us to say, that would mean that all prosecutions of African Americans from Philadelphia in the Eastern District of Pennsylvania are necessarily bad, cannot stand constitutional scrutiny. Where the pool does not reflect the population. I mean, that's the thing. I mean, this pool was 8.45% black, and the population was 16.82% black. I'm glad you put it that way, because isn't it in fact the case that in order to make a systemic argument of the sort you're making, you can't give the court a snapshot. You have to give the court, in effect, a movie, a series of points of data over a significant enough period of time for the assertion. And that was not done. You're correct that that was not done here. What was done was that the council below cited to a report from Pennsylvania that showed that this problem, and the specific problem being identified as using solely voter registration lists and not augmenting them as every other district in this circuit has done. Out of state. Every other district outside of the districts within Pennsylvania. I believe outside of, that could be right. Certainly outside of the case. Let me take you back to your concession. That was not done here. By conceding that, aren't you also conceding that you can't make out under the jurisprudence a prima facie case? I think the answer to that is no for this reason. Because the courts have never said that having that time series is an absolute requirement. What the courts have said is that you have to show a systematic problem. In Doran, the court implies at least that a systematic problem can be one that is, it's not systemic, it's systematic. The systematic problem is one that is built into the system. And the system here is one that, in the face of evidence that has been brought to the attention of the authorities over and over, that the court has maintained a list that has this racial impact. I thought our jurisprudence did say you had to have that. I thought that was the effort of Weaver. Weaver was saying it's not enough to give a snapshot. You're going to have a constitutional problem if there's this effect repeatedly over time. And hence my question. If you concede that wasn't done, haven't you conceded that a prima facie case under Doran cannot be met here? And my answer is that there may be other ways that Weaver did not preclude of showing that a problem is systematic. So here, for example, the existence of published information from a state commission and an article by the chief judge of the United States District Court of this district saying that this is a problem, that systematically the use of voter registration lists is reducing the number of minority African-Americans. Okay, but what does the statute say? What does the statute say? The statute says it directs federal district courts to compile their master lists primarily from voter records. Primarily. But the following sentence in section 1863b2 says, but where necessary to achieve its goals, and that goal being a fair cross-section of the community, it requires that the court prescribe some other source or sources of names. That would ultimately be a legal conclusion of sorts that would have to be reached by the court, would it not? By someone. After making numerous findings of fact, presumably in some kind of a proceeding, that fair cross-section cannot be met merely from the use of voter registration records. And that wasn't done here or anywhere else. Here, this is the reality. The reality is that in the face of analysis by a state commission, data that was ultimately taken into account by the chief judge of the United States District Court for the Eastern District of Pennsylvania, all of which showed that using only voter registration lists resulted in diminishing the number of minorities, that nonetheless the court, and in the face of a very easy solution. I'm not disputing that. I'm not disputing that there may be, certainly there are other ways, there may be better ways. That said, at least what we have in terms of a record before us is a district court that has followed the statute, and there has been no legal determination made that voting registration records in and of themselves are insufficient to guarantee that fair cross-section. All of that is correct. There was no legal proceeding where there was an extensive statistical analysis. It is also the case, you're right, that there was no legal ruling, but that's not what's required. What you had here was two things, and the question is, is it enough to create a systematic problem? Number one, that there was the disparities to which we pointed here, and number two, that it was a result of a well-known and easily corrected legal problem. And so what we're asking the court to do is to say when you have those two sets of facts, a well-recognized legal factual problem, undisputed, that would broaden the base from which jurors could be drawn, and the types of numbers that we have here, that that suffices to make a systematic show. Mr. D'Souza will be speaking for himself here. Maybe you don't have to look. Why don't you hit, if you would, the numbers. Why don't you strike that from the record? Yeah, I'll go strike that from the record.  Page 109 of the answering brief says, and I'm quoting, 14.1 percent of the qualified jurors on the panel and 16.7 percent of the panel jurors were African-American. Those percentages exceed those of the African-American population in the United States and are virtually identical to the population, African-American population in the Eastern District of Pennsylvania. Moreover, following the strikes by defense, 29 percent of the veneer consisted of African-American citizens. Their obvious implication that they want us to draw is you had more than a fair veneer, more than ample representation. And in fact, the numbers of qualified jurors and the numbers on the panel jury were about identical to the population of African-Americans. If their numbers are right, how can we look at this and say, well, wait a second, there was underrepresentation in the constitutional problem here? Because those numbers are truly irrelevant. Does it matter what the actual composition of the jury was? No. Does it matter what the veneer looked like after you guys finished your strike? No, no, no, no. It's just, it's the pool. The measure, you know, these are under this court's jurisprudence, under the Supreme Court jurisprudence, what matters is the composition of the pool versus the population. Those are the underlying statistics that matter. The ones that the government cites there, the ones that you just mentioned. It's systematically racially biased that you've got a jury that exactly reflects the composition of the population of Philadelphia. That's the argument. That's not my, that's not the argument. That's the law. That's the argument. No, really, that's the law. I mean, the law is very clear that those numbers, and by the way, you didn't, I mean, Judge Surek didn't, he didn't look at those numbers. I mean, I guess he could have because it was beforehand. But the numbers that one looks at are the percentage in the pool and the percentage in the population. Those numbers are irrelevant. Again, the conclusion to be drawn that we would say to the public of the United States is you've got a jury that exactly reflects the population numbers, constitutionally and firmly. You would be reversed by the Supreme Court. If that was the holding, you would have to be because that's not the law. The law is, I mean, if you hold that this is not systematic, I mean, I understand that. I know you may hold that it's not systematic. It won't be for that. It won't be for that reason, but I'm trying to get you to grapple with what they're saying, which is this, the numbers here, not only was there not a systematic problem because they didn't meet their prima facie obligation under Duran. They didn't meet the responsibility. They had under Weaver to show systematic exclusion over time. But in the end, you can look at the jury and say it's exactly what they're entitled to as a fair cross-section. I'm trying to get you to meet that assertion. The way I would meet that assertion is. Your assertion is it doesn't matter. My assertion is that's not what the case law tells courts to look at under these circumstances, including this court's case law in Howell and Weaver and including Duran. Those are not the numbers to which courts are supposed to pay attention. One could develop a jurisprudence that looked at those numbers. That is not the jurisprudence that this court is bound to follow in this case. Your view is that what we have to focus on or look at is the jury pool itself? All that you look at two numbers, the percentage of, in this case, blacks in the jury pool, in the veneer. When you say you, who are you? So the court. The court confronted with this motion. It looks at that and looks at the percentage in the population. It then engages in two different analyses, one that's called the absolute disparity analysis, one that's called the comparative disparity analysis. This court has undertaken that enterprise on at least two reported occasions, both Weaver and Howell, and that's what we argue about here. The question that we've been discussing with regard to whether it's systematic or not comes down to my argument, which is that it is systematic because what we were dealing with here was a well-known problem that explained the disparity that existed. And notwithstanding the lack of longitudinal data that I concede was not produced in the district court, that there was that raw material. And so what the court was doing in ruling as it did was to look the other way in the face of those facts. Thank you. Thank you, Mr. Lesbrueck. We will hear from Mr. Zosner, after which we will take a brief recess, and then we'll hear you on rebuttal. Mr. Zosner. Thank you, Your Honor. So a brief housekeeping with regard to Your Honor's question about the objections to the jury instructions. It begins at page 15225 of the appendix. It was actually counsel for Cadata Savage, Mr. Phillips, first made an objection about the intent instruction as it relates to aiding or vetting, and Mr. Hoey, counsel for Cavoni Savage, joined that objection. Right after that was when counsel for Mr. Merritt tried to just preserve everything, and the court made its comment that the counsel had to be specific. It was then page 15229 that Mr. Perpera made his objection, which concerned the order in which the counts were instructed to the jury. And he gave an argument. His argument was that by instructing on conspiracy before the Vicar counts, it might have lessened the jury's sense of the weight of the decision it had to make because conspiracy might somehow be easier to prove. But that was the objection that he made. And so that's the answer to the question as to what was presented. And then there were no further objections at that time. With regard to the selection of the jury, first with regard to section 3235, the venue provision, it all comes down to the 1862 repeal. And I think it's notable that my colleague's initial brief as appellant did not discuss the 1862 Act at all. And even in their reply brief, it's not quoted in full. And it's the full quote that matters. And it's not just the part about 12 petted juries being summoned. It's the very first words. It says that so much of section 29 of the Judiciary Act of 1789, it doesn't say the original Judiciary Act had basically two sentences. The trial shall be had in the county, and where that cannot be done without great inconvenience, 12 petted juries shall at least be summoned from thence. The Congress in 1862, as legislatures do, could well have said the last clause of that section is deleted. It didn't say that. It said that so much of section 29 of the Judiciary Act, that in cases punishable by death, 12 petted jurors to be summoned from the county where the offense was committed, be and the same is hereby repealed. There's a very clear reason that nobody else has successfully made this argument since 1862, because what we have right now is a simple statute. It's labeled venue in criminal cases that says the trial and the capital case shall be had in the county where the acts occurred. There is precedent on this from this court sitting in bank in the Ziccarelli case. And I know this wasn't the exact issue presented in Ziccarelli. That was a state case, and the question was whether you could try in one county something that was charged in another. It wasn't a federal capital case. But Judge Adams, for the court in Ziccarelli, presented an exhaustive scholarly discussion of the history of the offense. It disposes of the 12 juror issue in a footnote without dealing with the kind of argument that Mr. Lussberg has made here, right? That's right, but it's part of a lengthy discussion showing the steps that both venue and visinage went through, both in the Constitution and then in the Acts of Congress. And it flows directly from the discussion. And the conclusion that's reached is that there is no visinage requirement other than what is in the Sixth Amendment, which is that the jury shall be drawn from the district. And that ultimately is the deciding factor in Ziccarelli, that the jury in New Jersey consists of one district. And therefore, it doesn't matter constitutionally that the crime took place in one county and not another. So I think it's all part of a very clear discussion. And again, we're just relying on the explicit terms of the Act. With regard to the fair cross-section requirement, the presentation that was made here by the defense just pretty much fails in every respect. And I do agree with Mr. Lussberg, to be fair. He's right about what the law is, that the focus is on the veneer. In matters of this nature, we always point out to the court what the actual jury was and what the veneer in the courtroom was, because we want to know. We're human beings. This man's being tried for his liberty and maybe his life. I think it's important to point out that he was tried by a jury of his peers, that there was no racial discrimination in this case. This case really had nothing to do with race in any respect. But we want the court to know this was a fair trial. In terms of the law, we didn't write it. Dern wrote the law. And the focus does have to be on the entire jury panel that was available to the court, and not just those who were called for this case and not just the actual jury that served. But the flip side of this, and this is where the defense fails, is that there's very clear rules and requirements as to how we analyze the entire panel. And the defense did not remotely meet what this court has consistently asked for. There's not even a record here that we can talk about, and I'd like to just briefly explain that. So it starts with you have to look at what's the population of the district and what's the percentage on the veneer. The percentage of the district doesn't mean just a census number, so we're talking about African Americans here, of all African Americans in the Eastern District. It means who are the voting age eligible jurors. So step one, that information was never presented to the court. All that was presented to the court, and it wasn't presented by counsel from Mr. Savage. Well, what we had before us is essentially census data. Exactly. And Judge Surek picked up on that right away. In his opinion, he says, right away, that doesn't do it. We don't know. We're not talking about five-year-olds here. What's the voting age? So what he decides to do with it instead is he says, I'm going to look at the master wheel. I'll use that as a percentage and take a look at that. And we should have pointed out. I thought they used the qualified jury. Well, so he took the census data as one point, even though recognizing that it's inexact. He then has to come up with what wheel is he comparing to that census data, even though we're already inexact. And that's where he got to the qualified wheel. But it's interesting how he got there because, and this is a point I apologize, we did not make in our brief, but I just want to be thorough here. The master wheel, he said, can't use it because it has virtually no information about race. Sixty percent of people didn't reveal their race. So he says, I'm going to use the qualified wheel. The qualified wheel are the people who returned questionnaires. Now, what we overlooked and we should have pointed out is that this court in Weaver said, you can't use the qualified wheel as your point of comparison because you don't know how many people didn't return questionnaires. It's not a reliable number. You need more statistical data, and usually people bring in experts to mine the data to figure out what really was the actual racial percentage of the actual veneer that the court was using. So right away, we're just... On the government or on the defense? On the defense. The law is that it's a defense burden if they're presenting a challenge to the jury pool. And right from the start here, we're sort of just making up numbers, but I'll continue. So we've got this census number of 16.8%. We have the qualified wheel, the number that the district court says of the people who returned questionnaires is about 8%. And the court makes that comparison. That's our next mistake, which is that, and this we do brief extensively, that's just one moment in time. And to answer your honest question before, I disagree with my colleague. This court has been explicit that you have to show systematic exclusion over a period of time because of course the wheel... Why do you have to show it with longitudinal data? Why can you not show it with the results of a broader study like the state of Pennsylvania study? Well, first of all, the Pennsylvania study, the statement that the Pennsylvania Commission made is that there's often disparity. It didn't say that there's always a disparity. And that's the reason you use longitudinal data because at any moment in time, one wheel could be different from another. And they very commendably are just trying to avoid the problem and add more people to the wheel. But there's no conclusion there. There's no scientific conclusion that anyone has ever made that consistently the wheels in the Eastern District of Pennsylvania are inappropriate with respect to the percentage of African Americans. But beyond that, the other reason, and I know that this just may sound too definitive, but the other reason is this court has said you have to have longitudinal data. Ramsour is an embanked decision of this court, and it said two years is not enough. Ramsour had instances over a two-year period that said it's not enough. Howell is the recent case, says six months is not enough. Here we have nothing. We have a five-page submission by the defense in which all they looked at were the people who showed up in the courtroom. They offered nothing in terms of any relevant data, let alone any showing over time of a systematic exclusion. We just have nothing here to make the accusation that this entire wheel was not a fair cross-section of the population. And under this court's precedent, the motion was appropriately denied. Now even if, the final point I guess that's worth making, is that even if these numbers somehow have any meaning, which they don't, they don't set a worthy disparity under this court's precedent. We have an absolute disparity of 8%, if you accept these numbers, that the wheel had 8% and the population 16%. That's an absolute disparity of 8%. It's a comparative disparity of 50%. Howell is just the latest of many cases to say that that's within the realm of acceptability, given that we're never going to get precision here, and we are going to have shifting wheels as time goes by. Well, percent is a pretty significant number. I mean, we're not in earlier cases, you know, when we were looking at things and saying that relative disparity may look large, but it's not troubling because the base number is such a small one. Here, if we accept the base number as 16-plus percent, that's significantly larger than the small percentage that was at issue in the earlier case, right? I mean, you start talking about 50% on a larger number, should that be a cause for concern? So that's true of Weaver, but it is not true of Ramsour. That's a fair statement that in Weaver, you were dealing with a Hispanic population in the county of about 1%, and therefore you could wind up with some enormous disparity. Right, 75% in that case. Right, but Ramsour involved African Americans, I think, in Essex County, New Jersey, if I remember correctly, and the absolute disparity there was 14.1%. It was much larger. So 35% of the county was African American, according to actual statistical data that was provided to the court, unlike here, and 21.9% of the veneer, of the qualified veneer. So you had a 14% absolute disparity. You're talking numbers very similar to what the defense is suggesting here of allegedly hundreds of thousands of people that this is being underrepresented by, and this court sitting in bank says that's not sufficient, and the main reason in Ramsour is because there's not a sufficient showing over time. That might have been a one-time thing. If you were to tell me that there was a disparity like that, or a 50% disparity in this district over a period of years, yes, I would be very concerned about that. And, yes, the court should do something about that. But there's been no showing at all. Now, happily, we do see courts do take remedial efforts on their own. They should not be punished for that by having past verdicts thrown out. And I think steps like that are being taken now in the eastern district. But there's never been a showing. That's a worthwhile thing to ask, what exactly is happening, because it makes the point that Pennsylvania, you've got three districts that are just using the motor roles, but the other districts in this circuit all do something to deal with this and try to ameliorate or address concerns about underrepresentation. Judge Sanchez, chief judge of the district court, wrote an article that was published recently in the Temple Law Review explaining what the eastern district is doing based on a commission study. And it's not just expanding the wheel. It is making efforts to expand the wheel. But what Judge Sanchez explains is that there are many more steps to be taken, including community outreach and education. There are problems in the fact that all these questionnaires are sent by mail and not everybody really cares about their snail mail anymore. And so there are steps that are going to be taken to send multiple questionnaires to people who don't respond. So they're taking a whole series of steps to not just look at this problem, but to increase jury participation across the board. And that's a very good thing. But we come back to this case and the thousands and thousands and thousands of other cases that have been prosecuted in this district. And they are not infirmed constitutionally. We have used the voter rolls in this district for decades. And not only has there been no showing of a systematic exclusion over time, but that is the preferred method that's stated by Congress in the Jury Selection Act, is the use of voter rolls. The eastern district did not make it up by itself. And so that's why in the Howe case, in his concurrent opinion, Judge Porter recently wrote that for this court, not only has the use of the voter registration list been uniformly approved by the Courts of Appeals as the basic source for the jury selection process, Congress specifically approved the use of such lists, even though it was recognized that persons who chose not to register would be excluded from the jury selection process. So, yes, we can make things better, but we are within constitutional permissibility here and have been in the many cases that have been prosecuted. Thank you very much. Thank you, Mr. Chaffin. We will take a brief recess, after which we will hear from Ms. Blasberg in the budget. All right. Court stands in recess. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.